LAVERTTE, JR. AND CHERYL FILES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Files v. Commissioner
Docket No. 2310-71.
United States Tax Court
T.C. Memo 1976-98; 1976 Tax Ct. Memo LEXIS 306; 35 T.C.M. (CCH) 416; T.C.M. (RIA) 760098; March 29, 1976, Filed Lavertte Files, Jr., pro se. [1]
Richard D. Hall, Jr., and Frederick T. Carney, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, *307 Chief Judge: This case was assigned to and heard by Special Trial Judge Randolph F. Caldwell, Jr., pursuant to Rules 180 and 182, Tax Court Rules of Practice and Procedure. The parties have filed no exceptions of law or fact to Special Trial Judge Caldwell's report. The Court agrees with and adopts his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE CALDWELL, Special Trial Judge: This case was one of a group of 37 which were consolidated for trial, but not for opinion. At the trial, evidence was received which bears upon every case in the group. Such evidence relates to certain contractual arrangements between the husband-petitioners' employers, Lockheed Air Service Company (hereinafter, "Lockheed") and Dynalectron Corporation (hereinafter, "Dynalectron"), as well as the employment arrangements between field team members (such as the husband-petitioners) and such employers. Respondent determined a deficiency in petitioners' Federal income taxes for each of the years 1968 and 1969, in the respective amounts of $81 and $621.80. The only issue presented for decision is whether all or any portion of the per diem payments which petitioner Lavertte Files *308 (hereinafter, "petitioner") received from his employers in each of those years are includible in his gross income for such years under section 61(a)(1) of the Internal Revenue Code of 1954; [2] and if so, whether an amount equal to all or any portion of the includible per diem payments is deductible as away-from-home traveling expenses under section 162(a)(2). Respondent's partial disallowance of petitioners' claimed medical expense deduction for 1968 was predicated solely upon the increase in their adjusted gross income consequent upon his inclusion of the per diem payments in petitioner's gross income for that year. The propriety of such partial disallowance is therefore dependent upon the per/diem travel expense issue. FINDINGS OF FACT Petitioners, husband and wife, filed their 1968 and 1969 Federal income tax returns with the Internal Revenue Service Center at Chamblee, Georgia. The evidence of record does not establish their residence at the time the petition was filed in this case. Petitioner was employed as a field team member by Lockheed in 1968 and *309 a portion of 1969 and by Dynalectron during the remainder of 1969. Each of those companies had a contract with the United States Air Force to provide field team services for the maintenance and modification of weapons systems (i.e., aircraft) and/or support systems. These contracts were called "basic contracts" and the Air Force entered into such a contract with each of three different contractors. The contracts were for three years maximum duration, and those involved here were for the three fiscal years, July 1, 1967-June 30, 1968; July 1, 1968-June 30, 1969; July 1, 1969-June 30, 1970. The contract was firm for the first of the three years; but the Air Force had the unilateral right to extend the contract for the second and third years of the three-year period. The contracts were so extended by the Air Force insofar as both Lockheed and Dynalectron were concerned. (The record herein does not identify the third contractor who had the basic contract.) The basic contract did not, of itself, award any work to be performed thereunder. It did specify the wage rates which would be paid for services rendered by employees of the contractor, if the contractor got work to be performed *310 under the contract. The contract also contained the following provisions relating to the payment of per diem: (ii) Per Diem, not to exceed the applicable amounts set out below, when actually paid by the Contractor and approved by the Administrative Contracting Officer, shall be reimbursed to the Contractor, without regard to the duration of the assignment; provided, however, that no per diem shall be authorized or paid to any employee whose actual residence is within 50 miles of the work station to which the employee is assigned, nor shall any per diem be paid to any employee who actually resides at and commutes from his actual residence during the period of his employment, regardless of the distance between said residence and his assigned work station: (See (ii)(e) below). (a) In the CONUS (No quarters and messing facilities furnished by the Government)-- $11.00-Per day per man for Engineer and Leadman and $9.00-Per day per man for the remainder. * * * * *
(e) For the purpose of this contract the term "actual residence" is defined as the fixed or permanent domicile of an employee. The employee shall certify to the location of his fixed or permanent domicile and this location, *311 if accepted by the Contractor, shall be deemed, for the purpose of this contract, to be the employee's domicile in so far as per diem authorization against this contract is concerned. However, this does not relieve the Contractor of his responsibility to ascertain that the certification is valid. The opportunity for the contractor to perform under the basic contract arose from the issuance by the Air Force of a work order thereunder. Issuance of a work order was entirely within the discretion of the Air Force, and it alone had the discretion to select which one of the three holders of a basic contract that was to perform the work order. Performance under a work order might be at any place in the United States or at any place overseas where the Air Force maintained a base. Under the terms of the basic contract, work orders could only be issued during a given year of a basic contract. However, completion of a work order actually issued during such year might be effected after the end of the year. When the Air Force had determined to issue a work order and had notified a contractor of its selection to perform that order, representatives of the Air Force and of the contractor would *312 get together at a "pre-dock" meeting where the time for completion of the contract and the make-up of the contractor's projected field team complement would be worked out. Determination of the time of performance entailed fixing an input-output schedule -- the schedule which showed the number of units coming into the contractor for its maintenance and modification services per day or week or month, and the number of units to be completed by the contractor per day or week or month. After the projected field team complement had been worked out, the contractor would then proceed to get the team together. In assembling the team, the contractor would utilize two sources of manpower: (1) existing employees which it transferred from jobs under other work orders; and (2) new employees which it recruited. Whenever a contractor hired a new employee for field team work, that employee was advised that he was subject to being sent anywhere that the contractor might be called upon to perform a work order, and that if the employee was unwilling to travel where thus directed to go, his only alternative was to resign. The employee was also advised that the contractor only had a basic contract for *313 a year and that it had no way of knowing whether or when it would receive work orders under that contract. It was also made clear to the employee that, while the contractor would endeavor to continue to utilize the services of the employee after completion of the work order in connection with which he was hired, it could not guarantee any such further employment; and if none were available, the employee would be laid off. Neither Lockheed nor Dynalectron maintained any pool or central area where an employee who had completed an assignment could be sent pending the contractor getting another work order on which such employee could be used. Both Lockheed and Dynalectron were involved in the performance of work orders at Key Field in Meridian, Mississippi, during the years involved. [3]Lockheed had first come to Meridian in 1965 and it remained there until June 30, 1969, at which time (although it did not lose its status as holder of one of the three basic contracts) it was supplanted by Dynalectron. During the fiscal year ended June 30, 1969, Lockheed received two work orders to be performed at Meridian; and during the succeeding fiscal year, Dynalectron likewise received two work *314 orders. While in most instances, the contractor's field teams were sent to the location where the aircraft were located, in the case of the work orders performed at Meridian, the aircraft were brought by the Air Force to that work site from other locations. During the performance of a work order, the Air Force always had an on-site representative, monitoring the performance of the contractor. One of the areas of concern was to determine whether the field team was over strength or under strength, as well as the quality of work of the field team members. Instances occurred when the composition of the field team was changed as the result of the recommendation of the Air Force's on-site representative. For this reason, as well as for the reason that the composition of the field team varied according to the nearness in point of time to the beginning or the end of the performance under the work order, the projected field team complement as worked *315 out at the pre-dock meeting might vary as much as 10 to 20 percent during the performance of the contract. When an employee was hired, or rehired, by a contractor, he was required to certify to the contractor his "permanent or domicile" address (in the case of Lockheed) or his "fixed or permanent domicile" (in the case of Dynalectron). If the address so certified was further than 50 miles from the job site where the employee was to work and if the employee did not drive back and forth to work, irrespective of the address which he had furnished, he was paid the per diem mentioned and described above. The per diem payments made by the contractors were included in their invoices to the Air Force, solely for the purpose of being reimbursed. There was no element of profit to the contractors in the per diem for which they sought reimbursement. Per diem paid to the field team employees who qualified therefor was at the rate of $11 per day for a leadman and an engineer, and $9 per day for the other members of the field teams. Per diem was paid for seven days per week, although the regular work week for field team members was a 5-day, 40-hour week. Field team members also received per diem *316 during their initial travel to a work site, for days of travel when transferred to different work sites, and for a maximum of three days for return to their homes, in the event they were laid off. They did not receive per diem during vacation periods; but they did receive per diem for three days up to a maximum of six days if they were sick. Neither Lockheed nor Dynalectron withheld Federal income tax from the per diem payments made to their employees. Petitioner was hired by Lockheed on or about July 8, 1966, and was assigned to Key Field at Meridian, Mississippi, on or about November 16, 1968. He remained at Key Field with Lockheed until that contractor was supplanted there by Dynalectron. Petitioner was then hired by Dynalectron on or about July 28, 1969, and remained with that contractor at Key Field until April 23, 1970, when he was terminated as a Dynalectron employee. When petitioner was assigned to Key Field, he advised Lockheed that his "permanent or domicile address" was Le Tourneau Rural Station, Vicksburg, Mississippi; and when he became employed by Dynalectron he gave that contractor the same address as his "actual residence * * * fixed or permanent domicile." *317 Lockheed paid petitioner $405 of per diem in 1968. In 1969, he received $1,530 per diem payments from Lockheed and $1,278 of such payments from Dynalectron. He did not include any of the per diem payments in gross income on his return for either year. In his statutory notice of deficiency, respondent determined that all of the per diem received in each year was includible in his gross income for the year in which received under section 61. OPINION It must first be determined whether the per diem payments received by petitioner in each of the taxable years are includible in his gross income in the year received. It is believed that they are. In very broad and sweeping language, section 61(a)(1) provides that "gross income means all income from whatever source derived." The Supreme Court has construed this "broad phraseology" to evince a Congressional intention "to tax all gains except those specifically exempted." Commissioner v. Glenshaw Glass Co.,348 U.S. 426, 430. The per diem payments were "undeniable accessions to wealth, clearly realized and over which the [petitioner had] complete dominion," ( Commissioner v. Glenshaw Glass Co.,supra, p. 431); *318 and the Code contains no provision exempting per diem payments from taxation. Manifestly, then, respondent was correct in including in petitioner's gross income for each of the taxable years the per diem payments which petitioner received in each such year. Leo C. Cockrell,38 T.C. 470, 477-478, affd. (C.A. 8) 321 F.2d 504; Darrell Spear Courtney,32 T.C. 334, 341. [4]
The question remains whether petitioner is entitled to deduct under section 162(a)(2) an amount equal to any part or all of the includible per diem payments of each year, as expenses for travel while away from home in pursuit of his trade or business as an employee of Lockheed and Dynalectron, Leo C. Cockrell,supra, p. 479. In the Cockrell case, it was pointed out that the Supreme Court, in Commissioner v. Flowers,326 U.S. 465, rehearing denied 326 U.S. 812, had laid down three requirements that a taxpayer must meet to be entitled to deduct away-from-home expenses: The expenses must be (1) reasonable and necessary traveling expenses, (2) incurred *319 by a taxpayer while away from home, and (3) incurred in pursuit of business. In the present case, the parties are apart only on the point of whether petitioner was away from home. In the case of Truman C. Tucker,55 T.C. 783, 786, the factors to be considered in determining whether the taxpayer should be treated as away from home for tax purposes were crystallized. It was there said: The purpose of allowing the deduction of living expenses while a taxpayer is "away from home" is "to mitigate the burden of the taxpayer who, because of the exigencies of his trade or business, must maintain two places of abode and thereby incur additional and duplicate living expenses." Ronald D. Kroll,49 T.C. 557, 562 (1968). In furtherance of this purpose, when a taxpayer with a principal place of employment goes elsewhere to take work which is merely temporary, he may deduct the living expenses incurred at the temporary post of duty, because it would not be reasonable to expect him to move his residence under such circumstances. Emil J. Michels,53 T.C. 269 (1969); Ronald D. Kroll,supra. For this purpose, temporary *320 employment is the type which can be expected to last for only a short period of time. Beatrice H. Albert,13 T.C. 129, 131 (1949). Petitioner must then establish two points. First that his assignment to Meridian was temporary, as opposed to indefinite; and second, that he maintained two places of abode and incurred additional and duplicate living expenses. The only evidence received at the trial bearing on petitioner's case was that through the so-called "master witnesses." Perhaps such evidence could establish the temporariness of petitioner's Meridian assignment. However, it is not necessary to decide whether that assignment was temporary, for petitioner has presented no evidence that he maintained two places of abode and incurred additional and duplicate living expenses while working at Meridian. He has therefore not sustained his burden of proof that the respondent's determination was erroneous. Accordingly, he should not be allowed a deduction equal to all or any part of the per diem payments included in his income. Respondent's determinations should be sustained. * * * * *
In accordance with the foregoing, Decision will be entered for the *321 respondent.
Footnotes
1. DeQuincy V. Sutton was counsel of record for petitioners at the time of trial. Mr. Sutton died in August 1974, shortly after the last brief was filed. There is presently no counsel of record for petitioners.↩
2. All section references are to the Internal Revenue Code of 1954, unless otherwise specified.↩
3. The petitioner-husband in the present case, as well as all the other husband-petitioners, worked at Key Field in Meridian. It is this work at Meridian that is the common element that prompted the consolidation of the cases for trial.↩
4. See also Fred W. Phillips,T.C. Memo. 1973-58↩.